**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) DUNNIVEN ORLANDO PHELPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-365-CVE-JFJ |
| | ) | |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | Jury Trial Demanded |
| (2) RICHARD DUTRA, | ) | |
| (3) PATTY BUCHANAN, LPN, | ) | |
| (4) AMANDA GANN, RN, | ) | Attorney Lien Claimed |
| (5) VIC REGALADO, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

**COMES NOW**, Dunniven Orlando Phelps. ("Plaintiff"), and for his causes of action

against the above-named Defendants, alleges and states the following:

## **PARTIES, JURISDICTION AND VENUE**

1. Plaintiff was, at the pertinent times underlying this Complaint, a resident of Tulsa County,

Oklahoma. The causes of action in this matter are based on violations of Plaintiff's rights under

the Fourteenth Amendment to the United States Constitution.

2. Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability

company doing business in Tulsa County, Oklahoma.  Turn Key is a private correctional health

care company that contracts with counties, including, during the pertinent timeframe, Tulsa

County, to provide medical professional staffing, supervision and care in county jails. Turn Key

was at all times relevant hereto responsible, in part, for providing medical services, supervision and

medication to Plaintiff while he was in the custody of the Tulsa County Sheriff's Office ("TCSO").

Turn Key was additionally responsible, in part, for creating, implementing and maintaining

policies, practices and protocols that govern the provision of medical and mental health care to

inmates at the Tulsa County Jail, and for training and supervising its employees.  Turn Key was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3.    Defendant Richard Dutra ("Mr. Dutra") was at all times relevant hereto, an employee and/or agent of Turn Key/TCSO, who was, in part, responsible for overseeing Plaintiff's health and well-being, and assuring that Plaintiff's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, Mr. Dutra was acting within the scope of his employment and under color of State law. Mr. Dutra is being sued in his individual capacity.

4.    Defendant Patty Buchanan, LPN ("Nurse Buchanan"), was, at all times relevant hereto, an employee and/or agent of Turn Key/TCSO, who was, in part, responsible for overseeing Plaintiff's health and well-being, and assuring that Plaintiff's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, Nurse Buchanan was acting within the scope of her employment and under color of State law. Nurse Buchanan is being sued in her individual capacity.

5.    Defendant Amanda Gann, RN ("Nurse Gann") was, at all times relevant hereto, an employee and/or agent of Turn Key/TCSO, who was, in part, responsible for overseeing Plaintiff's health and well-being, and assuring that Plaintiff's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, Nurse Gann was acting within the scope of her employment and under color of State law. Nurse Gann is being sued in her individual capacity

6.    Defendant Vic Regalado ("Sheriff Regalado" or "Defendant Regalado") is the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of State law. Sheriff Regalado is sued purely in his official capacity.  It is well-established, as a matter of

Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Regalado in his official capacity, Plaintiff has brought suit against the County/TCSO. The Tulsa County Sheriff is the "Tulsa County official responsible for promulgating and enforcing policies for the [Jail], providing medical care to inmates and detainees, and operating the jail on a daily basis." *Wirtz v. Regalado,* No. 18-CV-0599-GKF-FHM, 2020 WL 1016445, at *6 (N.D. Okla. Mar. 2, 2020) (citing See 19 Okla. Stat. § 513; *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Cty.,* 237 P.3d 134, 142 (Okla. 2010)).

7.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

9.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

10.     Paragraphs 1-9 are incorporated herein by reference.

### A. Facts Specific to Plaintiff Dunniven Orlando Phelps

11.     Plaintiff was booked into the Tulsa County Jail on September 6, 2019 after being arrested for the non-violent misdemeanor of joyriding.

3

12.     At all pertinent times, Plaintiff was a pre-trial detainee.

13.     During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Plaintiff was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition.  During the intake screening process, Mr. Dutra further documented that Plaintiff was diabetic and had previously been diagnosed with mental health conditions.

14.     During the medical intake process, Plaintiff complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

15.     Despite the fact that Plaintiff told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Plaintiff be placed in general population and that he did not need a referral for a continuity of care plan.

16.     Further, Mr. Dutra failed to take any of Plaintiff's vital signs.

17.     Throughout the night of September 6, Plaintiff's symptoms significantly worsened, as he was obviously suffering from a stroke.

18.     By the morning of September 7, Plaintiff was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

19.     At approximately 9:37 a.m. on September 7, Defendant Buchanan "assessed" Plaintiff, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Plaintiff's blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.[1]

---

[1] American Heart Association, *High Blood Pressure, https://www.heart.org/en/health-topics/high-blood-pressure.* Last accessed September 3, 2021.

20.    Despite Plaintiff's verbal complaints about his condition, the fact that he couldn't move the left side of his body, and his high blood pressure, Nurse Buchanan noted on Plaintiff's chart that Plaintiff was "negative for stroke like [symptoms] during assessment..."

21.    Nurse Buchanan charted that all she did for Plaintiff at that time was "educated on the importance of taking all meds" and "instructed to avoid salt rich foods, factors that trigger increase BP, medications, treatments, follow-up sick call if no improvement."

22.    Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Plaintiff's alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

23.    This is despite the fact that, as an LPN, Nurse Buchanan's scope of practice is limited and focused mainly on administering treatment as directed by a physician, RN or Nurse Practitioner, checking vital signs, and performing visual assessments of patients.

24.    Nurse Buchanan's "assessment" of Plaintiff without consulting a more highly trained medical professional was far outside the scope of her license.

25.    Further, while Nurse Buchanan allegedly counseled Plaintiff on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, ***ever gave Plaintiff any medications during his time at the Jail.***

26.    Throughout the morning of September 7, Plaintiff's condition rapidly declined. He lost the ability to walk due to his stroke, and other inmates had to assist him to use the bathroom.

27.    When Plaintiff complained to Jail detention officers ("DO") about his serious medical condition, they ignored his pleas for help.

28.    In fact, some DOs made fun of Plaintiff, in cruel deliberate indifference to his obvious medical needs.

29.    On one occasion, when Plaintiff could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Plaintiff if he didn't get off the ground.

30.    Mercifully, an inmate who was an amputee let Plaintiff use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

31.    At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Plaintiff to the medical unit, where he was seen by Defendant Gann.

32.    Nurse Gann wrote on Plaintiff's chart that Plaintiff merely reported left-sided "weakness" (despite the fact that he literally could not walk). Astonishingly, since Nurse Gann noted that Plaintiff could raise "both eyebrows equally" and that there was allegedly "no arm or leg drift noted," she sent him away from the medical unit – without offering any treatment or notifying a physician – with the DO who had brought him there.

33.    At 4:05 p.m. on September 7, Plaintiff was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

34.    APRN Martin noted that Plaintiff had a ***"3 day history of evolving stroke like symptoms."*** She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a ***hypertensive crisis that requires immediate consultation and assessment by a physician***.

35.    APRN Martin also noted that Plaintiff had decreased response to painful stimuli on his left side.

36.    APRN Martin then allegedly informed Dr. William Cooper, a physician employed by Turn Key who, upon information and belief, is the Medical Director at the Jail, about Plaintiff's condition along with orders to send Plaintiff to an outside hospital for evaluation.

37.   Despite APRN Martin's orders that Plaintiff needed to be sent to a hospital for immediate evaluation, Plaintiff remained at the Jail in dire condition for another two (2) hours as his symptoms continued to worsen.

38.   Plaintiff continued to plead with Jail and Turn Key staff to send him to the hospital immediately until, finally, at 6:03 p.m. on September 7, he was given another assessment by Nurse Gann, who noted that Plaintiff was to be transported to the hospital by Jail security staff.

39.   At long last, Plaintiff arrived at the Hillcrest Medical Center Emergency Room at approximately 6:15 p.m.

40.   Physicians at Hillcrest noted that Plaintiff reported that he had developed "some weakness 3 days go and fell at the grocery store. Shortly after, he was arrested and was in jail for 2 days. *Patient states that while he was in jail, he was unable to move his left hand and leg, but nobody would believe him.*"

41.   Once at Hillcrest, Plaintiff was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

42.   It is imperative that once someone begins having a stroke that he is treated immediately in order to prevent the damage from the stroke from becoming permanent. Unfortunately, the delay in treating Plaintiff, due to Defendants' deliberate indifference, resulted in Plaintiff suffering permanent damage.

43.   Plaintiff is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

44.   Plaintiff suffered from additional serious health issues due to the stroke, including, but not limited to, deficits to his speech, and he had to undergo intensive speech pathology. Yet, he still suffers speech deficits.

45.    Plaintiff was only 46 years old at the time of his stroke. Due to Defendants' deliberate indifference, he will suffer debilitating damages for the remainder of his life.

## B. The Jail's Unconstitutional Health Care Delivery System / Policies and Customs

46.    The deliberate indifference to Plaintiff's serious medical needs and his safety, as summarized *supra*, was in furtherance of and consistent with: a) policies, customs, and/or practices which TCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and b) policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing.

47.    There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Both Sheriff Regalado and Former Sheriff Stanley Glanz have long known of these systemic deficiencies and the substantial risks they pose to inmates like Plaintiff but failed to take reasonable steps to alleviate those deficiencies and risks.

48.    For instance, in 2007, the NCCHC, a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies, and failure to address health care needs in a timely manner. NCCHC made these findings of deficient care despite Former Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

49.    Former Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings.

50.     There is a long-standing failure to secure adequate mental health care, and to properly classify and protect inmates with obvious and serious mental health needs.  For example, in 2009, TCSO was cited by the Oklahoma State Department of Health for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia.

51.     In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail.   The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested.  Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles").  Dr. Gondles was associated with the ACA as its medical director or medical liaison. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance" (hereinafter, "Gondles Report").  The Gondles Report was provided to the Jail Administrator, Michelle Robinette.  As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by the Jail's former medical provider, CHC.  After receiving the Gondles Report, Chief Robinette held a conference -- to discuss the Report -- with the Undersheriff, Administrative Captain and CHC/CHM.

52.     Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) understaffing of medical personnel due to CHM misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (g) nurses failing to document the delivery of health services; (h) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months.  Dr. Gondles concluded that "[m]any of the health service

9

delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider."  Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD").  According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system.

53.     Nonetheless, TCSO leadership chose not to follow Dr. Gondles' recommendations. TCSO did not establish a central Office Bureau of Health Services nor hire the "HSD" as recommended. Id.

54.     On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager".  In the email, Ms. Wyrick voiced concerns about whether the Jail's medical provider, Defendant CHMO, a subsidiary of CHC, was complying with its contract. Ms. Wyrick further made an ominous prognosis: "This is very serious, especially in light of the three cases we have now - what else will be coming? It is one thing to say we have a contract ... to cover medical services, it is another issue to ignore any and all signs we receive of possible [medical] issues or violations of our agreement with [CHC] for [health] services in the jail.  The bottom line is, the Sheriff is statutorily obligated to provide medical services."

55.     NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

56.     NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, inter alia, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past

year"; The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor."

57.     Former Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Former Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to 2010 NCCHC Report.

58.     Over a period of many years, Tammy Harrington, R.N., former Director of Nursing at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

59.     On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system - pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly

demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years".

60.     Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

61.     On the contrary, less than 30 days later the ICE-CRCL Report was issued, on October 27, 2011 another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.  A federal jury has since entered a verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams.

62.     In the wake of the Williams death, which was fully investigated by TCSO, Former Sheriff Glanz made no meaningful improvements to the medical system. This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

63.     On November 18, 2011 AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality."  AMS-Roemer specifically commented on no less than six (6) inmate deaths, finding deficiencies in the care provided to each.

64.     It is clear that Former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective

Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

65.     In November 2013, BOCC/TCSO/Former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, this step did not alleviate the constitutional deficiencies with the medical system. Medical staff was still undertrained and inadequately supervised and inmates were still denied timely and sufficient medical attention. Bad medical and mental health outcomes persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Former Sheriff Glanz and ARMOR (which provided financial disincentives for the transfer of inmates in need of care from an outside facility).

66.     In February 2015 an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by ARMOR to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that ARMOR failed to staff various medical positions in the Jail and recommending that the county withhold more than $35,000 in payments.  Her report shows that Jail medical staff often failed to respond to inmates' medical needs and that ARMOR failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

67.     In August 2016, an inmate named Mitchell Godsey died while being incarcerated at the Jail.

68.     Mr. Godsey suffered from diabetes and was insulin dependent, of which the Jail, including Armor staff, was aware.

69.     Jail and Armor staff provided woefully inadequate care to Mr. Godsey, who experienced obviously serious symptoms related to his diabetes during the three days he was housed in the Jail.

70.     Mr. Godsey's care was left up to unsupervised and undertrained LPNs, including one, Nurse Seth Whitman, whose first day on the job was the day that Mr. Godsey died.

71.     Nurse Whitman administered far too much insulin to Mr. Godsey – without an order from a physician – which caused Mr. Godsey's blood sugar to plummet, causing his death.

72.     Nurse Whitman was disciplined by the Oklahoma Nursing Board as a result of his actions pertaining to Mr. Godsey.

73.     Mr. Godsey never once was assessed or treated by a physician in the three days he was housed at the Jail prior to his death.

74.     On August 27, 2021, this Court denied Sheriff Regalado's and Armor's motions for summary judgment in the *Godsey* case. *See Bond v. Regalado, et al.,* Case No. 18-CV-231-GKF-CDL (N.D. Okla. 2018).

75.     This Court held that Mr. Godsey's Estate had demonstrated that, *inter alia,* a reasonable jury could conclude that: Armor maintained a policy or custom of understaffing the medical unit, allowing LPNs to treat inmates without proper supervision, and delaying or denying access to the Jail physician; that there was chronic understaffing in the medical unit at the Jail; there was a chronic lack of supervision with respect to charge nurses at the Jail; and that these issues caused Mr. Godsey's death.

76.     This Court also held that, *inter alia,* a reasonable jury could conclude that the County/TCSO/Sheriff Regalado maintained an unconstitutional healthcare delivery system, as the plaintiff presented evidence that: there is a longstanding failure to adequately staff the Jail with

qualified medical professionals; there is a longstanding failure to supervise medical staff; and the County/TCSO/Sheriff Regalado relied on minimally trained and unsupervised LPNs to medically monitor and treat inmates, including inmates with serious and complex conditions. This Court held that a reasonable jury could conclude that those longstanding deficiencies were the cause of Mr. Godsey's death.

77.    In approximately December 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained.

78.    The County/Sheriff Regalado replaced Armor with Turn Key in large part because Angela Mariana had concluded, in October 2016, that "[s]ince Armor has been [the medical provider at the Jail] there have been significant issues with no improvement. I am concerned that we have seen the best they can offer because these issues have been addressed and no improvements made."

79.    For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County and Creek County.

80.    To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

81.    There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit

15

Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

82.     Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail.  And TCSO/Tulsa County is responsible for the costs of all inmate hospitalizations and off-site medical care.  These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail to avoid off-site medical costs.

83.     These financial incentives create risks to the health and safety of inmates like Plaintiff who have complex and serious medical needs, such as drug and/or alcohol withdrawal, diabetes, seizure disorders and heart disease.

84.     Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs, including opiate withdrawal, heart disease and seizure disorder.

85.     Specifically, Turn Key's has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

86.     These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, diabetes, drug and/or alcohol withdrawal, heart disease and seizure disorder.

87.     Like the Jail's previous medical providers, Turn Key has an established policy, practice, and/or custom of allowing undertrained and unsupervised LPNs to, *de facto*, run the medical unit at the Jail.

16

88.     Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

89.     Indeed, decisions related to the assessment and treatment of Plaintiff were largely made by LPNs who failed to consult with a physician or other, more highly trained, medical professionals.

90.     Further, Plaintiff was never seen by a physician at the Jail.

91.     Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Plaintiff's.

92.     For instance, in June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

93.     An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

94.     A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints -- over several days -- of breathing problems were disregarded by responsible staff, and he lost consciousness.

95.     Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.   Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated.  Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was

faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him.

96.     In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in jail, he deteriorated significantly and his <u>clinical deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u> until he was nearly completely quadriplegic.***

(emphasis added).

97.     On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

98.     Like Plaintiff, Mr. Lee was largely assessed and treated by LPNs during his nearly three-

18

week incarceration at the Jail before his death.

99.     Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms continued to deteriorate.

100.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

101.    By its design, the Turn Key medical system was destined to fail.

102.    Dr. Cooper was the "Medical Director" and "physician" for **all** of these facilities, including the Tulsa County Jail.  In an effort to cut costs, Turn Key spread Dr. Cooper far too thin making it impossible for him to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

103.    In essence, Dr. Cooper was a "traveling" or roving Medical Director, traveling all over the State to each of jails for short blocks of time.  This constitutes plainly insufficient medical staffing, particularly for a large institution like the Tulsa County Jail.

104.    With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training.

105.    In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Plaintiff, with complex and serious medical needs, including diabetes, drug and alcohol withdrawal, heart disease and seizure disorder.

106.    With effectively no physician oversight of the clinical care, and no physician regularly on-site or reasonably available, the non-physician staff was improperly, and dangerously, expected to

act in the role of a physician, with the understanding that off-site care was to be avoided.

107.   This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical conditions, like Plaintiff, at substantial risk of harm.

108.   This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in Constitutional deprivations.

109.   TCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Plaintiff at excessive risk of harm.  However, TCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Plaintiff.

110.   Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Plaintiff.

111.   In addition, TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Plaintiff, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

112.   TCSO's failure to train and supervise Jail staff was admitted in 2018, the year preceding Plaintiff's negative health outcome at the Jail, by the TCSO Jail Administrator, who sent an email to Jail supervisors concerning Jail staff's many failures, in which he concluded: "What I see now is either people don't have the abilities to complete or excel in their positions which means we as a whole have failed. We either didn't train them, we didn't challenge them, we didn't hold them accountable (which doesn't always mean discipline)...."

## CAUSES OF ACTION

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

113.     Paragraphs 1-112 are incorporated herein by reference.

**A.     Underlying Violations of Constitutional Rights/Individual Liability**

114.     The Turn Key/TCSO staff, including Mr. Dutra, Nurse Gann, and Nurse Buchanan, as described above, knew there was a strong likelihood that Plaintiff was in danger of serious harm.

115.     As described *supra*, Plaintiff had serious and emergent medical issues that were known and obvious to the Turn Key/TCSO employees/agents, including Mr. Dutra, Nurse Gann, and Nurse Buchanan. It was obvious that Plaintiff needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed. Turn Key/TCSO employees/agents, including Mr. Dutra, Nurse Gann, and Nurse Buchanan, disregarded the known, obvious and substantial risks to Plaintiff's health and safety.

116.     As a direct and proximate result of this deliberate indifference, as described above, Plaintiff experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and medical expenses.

117.     As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

**B.     Municipal/"Monell" Liability (Against Turn Key)[2]**

118.     Paragraphs 1-117 are incorporated herein by reference.

---

[2]     "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], ***or*** for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz,* 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus he need not establish that Turn Key had final policymaking authority for Tulsa County.

119.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[3]

120.    At all times pertinent hereto, Turn Key was acting under color of State law.

121.    Turn Key has been endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

122.    Turn Key is charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

123.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

124.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Plaintiff's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

125.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Plaintiff.  Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Plaintiff's, serious medical needs.

---

[3]    "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.,* 175 F. App'x 943, 946 (10th Cir. 2005).

126.   Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

127.   Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Tulsa County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

128.   There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

129.   Turn Key is also vicariously liable for the deliberate indifference of its employees and agents.

### C.   Official Capacity Liability (Against Sheriff Regalado)

130.   Paragraphs 1-129 are incorporated herein by reference.

131.   The aforementioned acts and/or omissions of TCSO and/or Turn Key staff in being deliberately indifferent to Plaintiff's health and safety and violating Plaintiff's civil rights are causally connected with customs, practices, and policies which the County/TCSO promulgated, created, implemented and/or possessed responsibility for.

132.   Such policies, customs and/or practices are specifically set forth in paragraphs 46-112, *supra.*

133.   The County/TCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Plaintiff's, health and safety.

134.   The County/TCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively

denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

135.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Plaintiff suffered injuries and damages as alleged herein.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Robert M. Blakemore
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Muskogee, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

***Attorneys for Plaintiff***