IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DUNNIVEN ORLANDO PHELPS,<br><br>     Plaintiff,<br><br>v.<br><br>TURN KEY HEALTH CLINICS, LLC,<br>RICHARD DUTRA,<br>PATTY BUCHANAN, LPN,<br>AMANDA GANN, RN, and<br>VIC REGALADO, in his official capacity,<br><br>     Defendants. | Case No. 21-CV-365-GKF-JFJ |

## ORDER

Before the court is the Motion to Dismiss [Doc. 24] of defendant Turn Key Health Clinics, LLC. For the reasons set forth below, the motion is granted.

### I. Background

Dunniven Orlando Phelps brings a claim against defendant Turn Key pursuant to 42 U.S.C. § 1983 for alleged violations of Phelps's rights under the Fourteenth Amendment. Phelps seeks to recover against Turn Key under a municipal theory of liability, as outlined by the Supreme Court in *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1977). More specifically, Phelps alleges that Turn Key's customs, policies, and practices posed substantial risks to the health and safety of detainees like Phelps, but Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to the serious medical needs of inmates and detainees. [Doc. 2, ¶ 125]. Phelps also alleges that Turn Key is vicariously liable for the deliberate indifference of its employees and agents. [*Id.*, ¶ 127].

Beginning in December 2016, Turn Key contracted with the Tulsa County Sheriff's Office (TCSO) to provide healthcare at the Tulsa County Jail. On September 6, 2019, Phelps,

age 46 at the time, was booked into the Tulsa County Jail. Phelps alleges that, at the time of booking, he complained to Turn Key medical professional Richard Dutra that he had a severe headache, neck pain, and blurry vision. Phelps alleges that, by the following day, he had lost use of his left arm and leg. He sought medical attention from Turn Key healthcare staff—first from Patty Buchanan, LPN, during the morning of September 7 and then again from Amanda Gann, RN, later that afternoon. Phelps further alleges that, despite his symptoms, neither LPN Buchanan nor RN Gann offered him treatment or reported his condition to a physician. Two hours after being seen by RN Gann, Phelps was examined by APRN Elizabeth Martin. Martin ordered that Phelps be sent to a hospital, and, after a two-hour delay, Phelps was taken to Hillcrest Medical Center Emergency Room. APRN Martin also informed Dr. William Cooper, the Medical Director at the Jail, about Phelps's condition along with orders to send Phelps to a hospital for evaluation.

Phelps alleges that timely treatment of a stroke is imperative to prevent permanent damage and that, as a result of the delay in his treatment, he is now permanently paralyzed on the entire left side of his body; suffers from additional ongoing health issues, including speech deficits; and will require significant medical treatment for the rest of his life.

Turn Key moves to dismiss Phelps's § 1983 *Monell* claim and his theory of *respondeat superior* liability pursuant to Fed. R. Civ. P. 12(b)(6). [Doc. 24].

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim that "fail[s] to state a claim upon which relief can be granted." "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,* 861 F.3d 1081, 1104

(10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient." *Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016) (quoting *Twombly,* 550 U.S. at 555). The court accepts as true all factual allegations, but the tenet is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678.

Generally, failure to provide a prisoner medical care implicates the Eighth Amendment to the U.S. Constitution, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), but "[u]nder the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 868 (10th Cir. 1997) (quoting *Estate of Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994)). The court applies a deliberate indifference standard to claims brought under both amendments. *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020).

"To state a cognizable claim, Plaintiff 'must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Strain*, 977 F.3d at 989 (quoting *McBride v. Deer*, 240 F.3d 1287, 1289 (10th Cir. 2001)). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bryan Cnty.*, 520 U.S. at 410); *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989) ("a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities"). It

3

"includes an objective component and a subjective component." *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018). "The objective component of the test is met if the 'harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment," *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005)).[1] To satisfy the subjective component, a plaintiff must allege officials "kn[e]w[] of and disregard[ed] an excessive risk to inmate health or safety." *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019).

### III. Analysis

A. The *Respondeat Superior* Theory

As previously mentioned, Phelps alleges that Turn Key is vicariously liable for the acts of its employees and agents. [Doc. 2, ¶ 129]. A municipality, though a "person" for purposes of § 1983, "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Rather, counties may be liable only under a theory of municipal liability. *See Monell*, 436 U.S. at 694. Under Tenth Circuit precedent, these same principles apply when the defendant is a private entity acting under color of state law, like Turn Key in its role as contracted medical provider at the Jail. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *see also Lee v. Turn Key Health Clinics, LLC*, 2020 WL 959243, at *8 (N.D. Okla. Feb. 27, 2020). Because the Tenth Circuit has extended *Monell* to private entities acting under color of state law, Turn Key "cannot be held liable under § 1983 on a *respondeat superior* theory." *Dubbs*, 336 F.3d at 1216 (quoting *Monell*, 436 U.S. at 691); *Bradshaw ex rel. Bradshaw v. Armor Correctional Health Servs., Inc.*, 2019 WL 1675148, at *7 (N.D. Okla. Apr. 17, 2019); *see also Beauford v. Mesa Cnty., Colo.*, 35 F.4th

---

[1] Phelps has met the objective component of the test, and Turn Key does not challenge the sufficiency of the pleadings in that respect.

1248, 1274-75 (10th Cir. 2022). Accordingly, plaintiff's claim is dismissed insofar as it relies on a theory of *respondeat superior* liability.

B. The *Monell* Claim

To state a claim for municipal liability, a plaintiff must allege (1) the existence of an "official policy or custom[,] (2) causation, and (3) state of mind." *Burke*, 935 F.3d at 998 (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir 2013)).

"The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; and (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010). Causation requires the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770. And finally, the state of mind element requires that a plaintiff "demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by a prison official. However, the deliberate indifference inquiry becomes an objective standard which is satisfied if

the risk is so obvious that the entity acting under state law should have known of it. *Barney*, 143 F.3d at 1307, n.5.

Turn Key contends that Phelps has failed to plausibly allege that any policy, practice, or custom of Turn Key caused Phelps's alleged constitutional deprivation. Phelps alleges Turn Key had an established practice of failing to adequately assess and treat symptoms of emergent and life-threatening conditions and that the failures resulted from (1) financial incentives to avoid the costs of inmate prescription medications and off-site treatment; (2) inadequate staffing; and (3) failure to train and supervise medical staff in the assessment and care of detainees with complex and serious medical needs.[2] [Doc. 2, ¶¶ 85-86].

1. **Financial Incentives**

Plaintiff alleges that Turn Key's contract with TCSO disincentivized Turn Key from prescribing and administering medications at the Jail and from transferring inmates to off-site facilities for treatment to save money, at the expense of inmates' well-being. [Doc. 2, ¶ 82]. However, "the naked assertion that Defendants considered cost in treating [an inmate's medical condition] does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Sherman v. Klenke*, 653 F. App'x 580, 592-93 (10th Cir. 2006). The Complaint includes no allegations from which the court may infer that cost-saving measures were the moving force behind Phelps's alleged constitutional deprivation. *See Plunkett v. Armor Correction'l Health Servs., Inc.*, 2022 WL 997357, at *4 (N.D. Okla. Apr. 1, 2022); *Lee*, 2020 WL 959243, at *7.

---

[2] Phelps's allegations concerning the alleged deficiencies in medical care provided at the Jail prior to the date Turn Key was retained in December of 2016 [Doc. 2, ¶¶ 47-73] are not relevant to Turn Key's policies, customs, and practices at the time of Phelps's detention in September 2019.

### 2. Inadequate Staffing

Phelps's allegations of staffing deficiencies fall into two categories—inadequate staffing with underqualified medical personnel and chronic unavailability of an on-site physician.

Phelps alleges that the Jail had "an established policy, practice, and/or custom of allowing undertrained and unsupervised LPNs to, *de facto*, run the medical unit at the Jail." [Doc. 2, ¶ 87]. However, the actual course of Phelps's medical care, as alleged, reveals that he was seen by an LPN, an RN, and an APRN within a twenty-three (23) hour period. It is therefore implausible that inadequate staffing with underqualified medical personnel was the moving force behind plaintiff's constitutional violation.

Phelps alleges that Dr. William Cooper is the Medical Director at the Jail, that he traveled to each jail under contract with Turn Key for short blocks of time, and that, as a result, "[w]ith no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training." [*Id.*, ¶¶ 102-104]. However, Phelps does not allege that Dr. Cooper was inaccessible on September 7, 2019, nor does he allege that either LPN Buchanan or RN Gann attempted to contact Dr. Cooper. To the contrary, Phelps alleges that APRN Martin contacted Dr. Cooper on September 7 and informed him "about Phelps's condition along with orders to send [Phelps] to an outside hospital for evaluation." [*Id.*, ¶ 36]. Thus, Phelps has not plausibly alleged that a custom or practice of physician unavailability constituted a moving force behind Phelps's alleged injuries.

### 3. Failure to Train and Supervise

A municipality can incur liability for a failure to train only when the policy itself reflects deliberate indifference; in other words, the failure to train must "reflect . . . a 'deliberate' or 'conscious' choice by a municipality." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). This same standard

applies when a plaintiff seeks to impose liability for a failure to supervise. *Bryson*, 627 F.3d at 788.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see also Canton*, 489 U.S. at 391 ("identified deficiency in the [defendant's] training program must be closely related to the ultimate injury"). Accordingly, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62. However, the Supreme Court has not foreclosed the possibility that, in rare circumstances, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Such rare circumstances may exist when a municipality fails to train employees in "specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Barney*, 143 F.3d at 1308.

Here, Phelps has failed to identify a particular deficiency in Turn Key's training program that resulted in Phelps's injury. Nor has he shown a pattern of similar constitutional violations that would have put Turn Key on notice that a failure to train was likely to result in a constitutional violation. The one prior incident that occurred at the Tulsa County Jail during Turn Key's tenure was the 2017 death of Caleb Lee. [Doc. 2, ¶¶ 97-98]. In *Lee*, however, plaintiffs' municipal liability theory of failure to train—as well as failure to supervise—were dismissed on the pleadings. *See Lee*, 2020 WL 959243, at *8. Moreover, this single incident—even if related—is insufficient to constitute a custom or practice. *See Wilson v. Cook Cnty.,* 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—

or even three incidents—do not suffice"); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (holding that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); *Abila v. Funk*, 2016 WL 9021834, at *19 (D.N.M. Dec. 14, 2016). Thus, Phelps has failed to state a claim for municipal liability predicated on failure to train.

Plaintiff's failure to supervise allegations are also insufficient. Plaintiff alleges "there was an utter lack of physician supervision over the clinical care provided to the inmates" in each of the prior incidents it identifies in the Complaint. [Doc. 2, ¶ 99]. However, as previously noted, only one of those incidents occurred during Turn Key's tenure—Caleb Lee's death. Phelps alleges that "Lee was largely assessed and treated by LPNs during his nearly three week incarceration at the Jail before his death" during his incarceration. [Doc. 2, ¶¶ 98, 100]. Again, a single prior incident is insufficient to constitute a pattern or practice. *Wilson*, 742 F.3d at 780; *Andrews*, 98 F.3d at 1076; *Abila,* 2016 WL 9021834, at *19. Additionally, even if the single incident can constitute a pattern or practice, Phelps has not alleged a causal connection here. Phelps was seen by an LPN once on the morning of September 7. By 2:19 p.m. that same day, he was seen by an RN, and by 4:05 p.m., he was seen by an APRN, who contacted the Jail's physician about Phelps's condition along with orders to send Phelps to a hospital for evaluation. Unlike *Lee*, who was largely assessed and treated by LPNs over an extended period, Phelps was examined an LPN on the morning of September 7, and, within hours, was seen by an RN and an APRN. Thus, Phelps has failed to allege a causal connection between the alleged failure to supervise LPNs and his injury.

## IV.  Conclusion

WHEREFORE, defendant Turn Key Health Clinic, LLC's Motion to Dismiss [Doc. 24] is granted.

IT IS SO ORDERED this 23rd day of August, 2022.

*[signature]*
GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE